IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

OPTIMUM TECHNOLOGIES, INC.,

    Plaintiff,

       v.

HENKEL CONSUMER ADHESIVES,
INC., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:04-CV-1082-TWT

OPINION  AND  ORDER

This is an action for trademark and trade dress infringement, breach of fiduciary duty, and fraud.  It is before the Court on Defendant Henkel Corporation's Motion for Summary Judgment [Doc. 75], Defendant Henkel Consumer Adhesives, Inc.'s Motion for Summary Judgment [Doc. 76], and Defendant Henkel Consumer Adhesives, Inc.'s Request for Oral Argument [Doc. 154].  For the reasons set forth below, the Court GRANTS Defendant Henkel Corporation's Motion for Summary Judgment, GRANTS IN PART and DENIES IN PART Defendant Henkel Consumer Adhesives, Inc.'s Motion for Summary Judgment, and DENIES Defendant Henkel Consumer Adhesives, Inc.'s Request for Oral Argument.

## I.  BACKGROUND

Plaintiff Optimum Technologies, Inc. ("Optimum") is a family-owned company based in Cartersville, Georgia.  It manufactures and sells a variety of flooring-related products.  Optimum's main revenue producing product is the Lok-Lift Rug Gripper, a product that can be applied in strips to the back of rugs and mats to secure them in place and prevent slippage on hard surfaces and carpets.  Optimum is the registered owner of the LOK-LIFT mark.  Defendant Henkel Corporation is a holding company for The Henkel Group, a German corporation.  In 1998, Henkel Corporation acquired all of the outstanding shares of Manco, Inc.  In May 2002, Manco, Inc. changed its name to Henkel Consumer Adhesives, Inc. ("HCA").[1]  Defendant HCA, a subsidiary of The Henkel Group, develops and distributes consumer goods.  Approximately half of the products distributed by HCA are manufactured by outside suppliers.  Optimum was one such supplier.

From 1983 until 1994, Optimum offered its Lok-Lift Rug Gripper for sale to consumers through catalogs and retail accounts.  In late 1993, Optimum and HCA entered into a business relationship, pursuant to which HCA would distribute Lok-Lift Rug Gripper to retail accounts as part of its Do-It-Yourself product line.  To facilitate

---

[1]Manco, Inc. and Henkel Consumer Adhesives, Inc. will be collectively referred to as HCA.

the relationship, Optimum turned over the bulk of its established retail accounts to HCA.   In January 1994, HCA began distributing Lok-Lift Rug Gripper.   For approximately nine years, HCA purchased Lok-Lift Rug Gripper from Optimum through purchase orders and then sold the product to various retailers, including The Home Depot, Ace Hardware, and Lowe's.   During this time, HCA was authorized to use Optimum's trademarks.

In 1998, HCA began the process of developing a foam-backed latex material that would hold rugs and mats in place on floors.   HCA viewed the product as a potential replacement for Lok-Lift Rug Gripper.   HCA's product, which was eventually named Hold-It For Rugs, is similar to Lok-Lift Rug Gripper. But there are some differences between the products.   For instance, Hold-It For Rugs has an adhesive substance on only one side of the product rather than both sides.   In addition, the products do not have identical uses.   Hold-It For Rugs is not intended to, and does not, hold rugs in place on carpet, whereas Lok-Lift Rug Gripper works on hard surfaces as well as carpet.

Throughout the development process of Hold-It For Rugs, HCA continued to purchase Lok-Lift Rug Gripper from Optimum for distribution to retailers.   In December 2002, HCA launched its new product and began shipping Hold-It For Rugs to retailers.   HCA kept the development of Hold-It For Rugs confidential.

Consequently, Optimum was unaware that HCA had plans to replace Lok-Lift Rug Gripper with a new product until January 17, 2003, when an Optimum employee discovered Hold-It For Rugs in a retail store.  Optimum promptly contacted HCA to inquire about the product and was informed that HCA had decided to take a new direction with its business and was terminating the distributorship relationship. Nevertheless, following implementation of Hold-It For Rugs and termination of the business relationship, HCA's web sites continued to contain several references to the Lok-Lift Rug Gripper product, including referring to Hold-It For Rugs as part of the Lok-Lift product line.  In addition, if consumers searched the HCA site for retailers selling Lok-Lift Rug Gripper, they were directed to retailers selling Hold-It For Rugs. HCA removed the references after being notified by Optimum of the unauthorized uses of the marks.

Optimum alleges that the Defendants infringed the registered LOK-LIFT mark and the unregistered RUG GRIPPER mark, thereby violating sections 32(a) and 43(a) of the Lanham Act, 15 U.S.C. §§  1114(1), 1125(a).[2]  Optimum also asserts a claim

---

[2]When a plaintiff alleges infringement of a registered trademark, the claim is properly asserted under 15 U.S.C. § 1114(1).  Ross Bicycles, Inc. v Cycles USA, Inc., 765 F.2d 1502, 1506 (11th Cir. 1985).  Section 1125(a) provides a basis for asserting a trademark infringement claim when the trademark has not been registered. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 776 (1992).  Although Optimum seems to assert its infringement claim under section 1125(a) only, the Court will construe its claim based on the registered LOK-LIFT mark as one under section 1114.

for trade dress infringement, 15 U.S.C. § 1125(a); federal unfair competition, 15 U.S.C. § 1125(a)(1)(A); violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 *et seq.*; and common law unfair competition.  Furthermore, Optimum alleges that the Defendants are liable for breach of confidential relationship, breach of fiduciary duty, fraud, fraudulent concealment, and negligent misrepresentation.  Henkel Corporation and HCA move for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

---

The Court notes, however, that the likelihood of confusion test applies to claims brought under either section.

III. <u>DISCUSSION</u>

A.    <u>Henkel Corporation</u>

In its Original Complaint, Optimum named Henkel Corporation as a defendant to all of its claims.  Henkel Corporation is the holding company that was responsible for acquiring the outstanding shares of Manco, Inc. in 1998.  Although it purchased the shares of Manco, Inc., which later changed its name to HCA, Henkel Corporation is a separate company from HCA and it did not assume responsibility for or control over HCA's distribution of consumer adhesives products.  Optimum has never had any business dealings with Henkel Corporation.  It has failed to present any evidence that Henkel Corporation was involved in any of the acts alleged in the Complaint.  Thus, Henkel Corporation moves for summary judgment.  Rather than oppose the motion substantively, Optimum argues that it should be granted leave to file its First Amended Complaint and add Henkel KGaA in lieu of Henkel Corporation.[3]  As such, Optimum effectively concedes that Henkel Corporation is not a proper party to this action.

Moreover, Henkel Corporation's only apparent connection to this action is the fact that it purchased the Manco, Inc. stock.  Under Georgia law, a parent corporation

---

[3]The Court has denied Optimum's motion for leave to amend its complaint to add Henkel KGaA as a defendant.

is distinct from and maintains a separate identity from its subsidiary, provided that corporate forms are maintained.  See Worsham v. Provident Cos., Inc., 249 F. Supp. 2d 1325, 1340-41 (N.D. Ga. 2002); Boafo v. Hospital Corp. of Am., 177 Ga. App. 75, 76-77 (1985).  Thus, in order to impose liability on Henkel Corporation for the alleged tortious conduct of HCA, Optimum must present evidence that HCA is merely the alter ego of Henkel Corporation.  Optimum has failed to present any such evidence.  Summary judgment for Henkel Corporation is warranted.

> B.     Henkel Consumer Adhesives, Inc.

> 1.     Trademark Infringement

Optimum asserts a claim against HCA for trademark infringement, pursuant to 15 U.S.C. § 1114(1), based on HCA's alleged infringing use of the LOK-LIFT trademark.  In addition, Optimum alleges that HCA infringed its unregistered RUG GRIPPER mark, in violation of 15 U.S.C. § 1125(a).  It accuses HCA of infringing by using the marks on HCA's web sites and by using the RUG GRIPPER mark in sales presentations.  Optimum also alleges that HCA infringed its marks because retailers such as Home Depot and Ace Hardware, displayed Hold-It For Rugs on shelves indicating that the product was Lok-Lift Rug Gripper and misidentified the product on their web sites.  (See Pl.'s Opp'n, at 9-10.)  However, these alleged infringing uses are only attributable to the retailers, not HCA.  Optimum argues that

HCA was jointly responsible with Home Depot for maintaining the product displays in Home Depot stores.  (Pl.'s Supplemental Br. in Opp'n, at 3-4.)  But, there is no evidence that HCA was responsible for generating the Home Depot pricing stickers or shelving labels, which referred to the Hold-It For Rugs product as Lok-Lift Rug Gripper, or for placing the allegedly infringing stickers on the shelves.  In order to hold HCA responsible for infringement by the retailers, Optimum needed to assert a claim of contributory infringement and establish that HCA intentionally induced the retailers to infringe the trademarks or continued to supply Hold-It For Rugs when it knew or had reason to know that the retailers were infringing the marks.  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982); Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1522 (11th Cir. 1992).  However, Optimum did not plead a claim for contributory infringement.  Consequently, the Court will not consider any arguments associated with contributory infringement.  Furthermore, the allegations of infringing activities by the retailers have no relevance to Optimum's pled infringement claims and also will not be considered.

Optimum alleges that HCA infringed the LOK-LIFT mark by continuing to use the mark, directly and as a metatag, on its "henkelcamsds.com" and "henkelca.com"

web sites, after HCA terminated the parties' relationship.[4]  The "henkelcamsds.com"

web site contained a product search page where consumers could select a product line

to search from a drop-down menu.  The "Loklift" product line was included among

the options offered by the menu.  (Pl.'s Opp'n, Ex. 36.)  Searching the "Loklift"

product line produced eleven results.  (Id.)  Of the eleven results, nine featured a

picture of the Hold-It For Rugs product, and four of those nine described the product

as "Lok-Lift Rug Gripper."  (Id.)  The "henkelca.com" web site contained a "Where

to Buy" page that allowed consumers to enter their address and find nearby retailers

that carried desired products.  Consumers were once again given the option of

selecting a specific product from a drop-down menu.  One product option presented

to consumers was "Lok-Lift Rug Gripper."  (Id.)  Optimum argues that consumers

who selected this option would be directed to retailers that were actually selling Hold-It

For Rugs.

　　Optimum claims that HCA used the LOK-LIFT mark directly on the

"henkelcamsds.com" web site but as a metatag in the "henkelca.com" web site.

However, both sites used the mark in a similar fashion: as an option in a drop-down

---

[4]The printouts of the web sites produced by Optimum indicate how the web sites appeared as of June 21, 2004.  (Pl.'s Opp'n, Ex. 36.)  HCA states that the complained-of references to LOK-LIFT and RUG GRIPPER have since been removed from the sites. (Heffner Second Decl. ¶ 7.)  Optimum has not presented evidence to the contrary.

search menu.  Although the searches produced different types of results, both web sites used the LOK-LIFT mark directly.  There is no evidence that HCA used the mark as a metatag.  Metatags, which are part of a web site's HTML (HyperText Markup Language) code, describe the content of the web site and help search engines identify sites which relate to keywords entered by Internet users.  Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 810 n.1 (7th Cir. 2002); Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1045 (9th Cir. 1999); see also 4 McCarthy on Trademarks and Unfair Competition § 25:69 (4th ed.) (A metatag is "a list of words normally hidden in a web site that acts as an index or reference source identifying the content of the web site for search engines.").  Metatags are not visible to the Internet user.  Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 541 n.1 (4th Cir. 2004); Brookfield Communications, Inc., 174 F.3d at 1061 n.23.  The "henkelca.com" web site's use of the LOK-LIFT mark was certainly visible to the Internet user, and Optimum has not presented any evidence that the mark was written into the hidden HTML code of the site.  Thus, the Court will not characterize the use of the mark on the "henkelca.com" site as a metatag.

Section 32(a) of the Lanham Act provides that a defendant is liable for infringement if, without consent, it uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion,

or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).  Thus, in order to prevail

on a claim of infringement of a registered mark, a plaintiff must prove that: (1) its mark

has priority, and (2) the defendant's use of the mark is likely to cause confusion.

Frehling Enters., Inc. v. International Select Group, Inc., 192 F.3d 1330, 1334 (11th

Cir. 1999).  Optimum's ownership of and exclusive right to use its LOK-LIFT mark

is undisputed.  The only issue to be determined is whether HCA's use of the LOK-

LIFT mark on its web sites is likely to cause confusion.

To determine whether there has been a likelihood of confusion, the following

factors should be assessed: (1) the type of mark; (2) the similarity between the

plaintiff's mark and the allegedly infringing mark; (3) the similarity between products

offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the

similarity of advertising methods; (6) the defendant's intent, i.e., did the defendant

hope to gain a competitive advantage by associating its product with the plaintiff's

established mark; and (7) actual confusion.  Alliance Metals, Inc., of Atlanta v. Hinely

Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000); Frehling Enters., Inc., 192 F.3d at

1335.  No one factor is dispositive as to the determination of whether there is a

likelihood of confusion.  Nor is likelihood of confusion to be determined by simply

tallying the number of factors in each party's column.  Rather, the Court must evaluate

and assess the weight to be afforded each factor based on the circumstances of the

case.  Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1207 (11th

Cir. 2004); Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 840 n.17

(11th Cir. 1983).  An analysis of fewer than all seven factors may support, or negate,

a finding of likelihood of confusion.  See University of Georgia Athletic Ass'n v. Laite,

756 F.2d 1535, 1542 (11th Cir. 1985).  However, the Eleventh Circuit considers the

type of mark and evidence of actual confusion to be the most probative of likelihood

of confusion.  Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1201 n.22

(11th Cir. 2001) (citing Dieter v. B&H Indus. of Southwest Florida, Inc., 880 F.2d

322, 326 (11th Cir. 1989)).

        In analyzing the type of mark, the Court must evaluate whether the mark is

strong or weak in order to determine the level of protection to be afforded.  Frehling

Enters., Inc., 192 F.3d at 1335.  The more distinctive a mark, the stronger it is

considered, and the more protection it warrants.  Jellibeans, Inc., 716 F.2d at 840.

Trademarks are classified into four categories, based on degree of strength and

distinctiveness:   (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or

fanciful.  Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 797-98 (11th Cir.

2003).  Generic marks suggest the basic nature of a product and are the weakest.

Descriptive marks identify characteristics or qualities of a product.  The distinction

between generic and descriptive marks is simply a matter of degree.  Id. at 798.

Suggestive marks suggest characteristics of a product and require an effort of the imagination by the consumer in order to be understood as descriptive.  <u>Id.</u>  Finally, arbitrary or fanciful marks, the strongest of the four categories, bear no inherent relationship to the product.  <u>Id.</u>  The LOK-LIFT mark is arbitrary.  It bears little or no relation to a product that is designed to hold rugs in place.  In addition, the LOK-LIFT mark has achieved incontestable status, under 15 U.S.C. § 1115(b), which enhances the mark's strength.  <u>Frehling Enters., Inc.</u>, 192 F.3d at 1336.  The strength of the LOK-LIFT mark weighs in favor of finding likelihood of confusion.

Although not necessary to a finding of likelihood of confusion, the Eleventh Circuit has repeatedly stated that evidence of actual confusion is the best proof of likelihood of confusion.  <u>Alliance Metals, Inc.</u>, 222 F.3d at 907 ("The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion."); <u>Frehling Enters., Inc.</u>, 192 F.3d at 1340 ("It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion."); <u>Jellibeans, Inc.</u>, 716 F.2d at 840 n.17 ("While proof of actual confusion is not required to sustain a claim of infringement, the view of this court is that it is the best evidence of likelihood of confusion.") (<u>quoting</u> <u>Roto-Rooter Corp. v. O'Neal</u>, 513 F.2d 44, 45-46 (5th Cir. 1975)).  Optimum argues that evidence of actual confusion exists because retailers were confused about the differences between the products.  But there is no evidence

that any confusion on the retailers' part resulted from HCA's use of the LOK-LIFT mark.  Optimum also claims that consumers were confused about the association of the products based on consumer complaints made to HCA customer service.   This evidence, however, is not probative for a number of reasons.  First, this purported evidence of actual confusion is based entirely on narratives of complaints composed by customer service representatives.  The Court is unable to determine from these statements the context of and actual basis for the consumers' complaints.  Second, as with the retailers, there is no evidence that the use of the mark on the web sites caused any of the consumer confusion allegedly indicated by these complaints.

Although Optimum has failed to present any direct evidence of actual confusion, the use of "Lok-Lift Rug Gripper" in the retailer locator function of the "henkelca.com" site could result in initial interest confusion.  Initial interest confusion, which is a recognized form of infringement under the Lanham Act, occurs when a "competitor lur[es] potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated."  Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 294 (3d Cir. 2001); see also Promatek Indus., Ltd., 300 F.3d at 812 (Initial interest confusion occurs when a "customer is lured to a product by the similarity of the mark, even if the customer realizes the true

source of the goods before the sale is consummated."); Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 204 (5th Cir. 1998) ("Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion.") (citations omitted); Foxworthy v. Custom Tees, Inc., 879 F. Supp. 1200, 1215-16 (N.D. Ga. 1995) (quoting Brach Van Houten Holding, Inc. v. Save Brach's Coalition, 856 F. Supp. 472, 475 (N.D. Ill. 1994) ("[C]onfusion should be measured based on an initial understanding, rather than an understanding that may develop after careful reading of the material.")).  Consumers who searched for retailers selling "Lok-Lift Rug Gripper" were instead apparently directed to retailers selling Hold-It For Rugs.  By diverting consumers to retailers selling Hold-It For Rugs, HCA could be improperly benefitting from the goodwill Optimum developed in the LOK-LIFT mark.

In addition to the strength of the mark and the potential for initial interest confusion, Optimum argues that the remaining factors also support a finding of likelihood of confusion.  It is undisputed that the marks at issue are identical.  Nor is it disputed that Lok-Lift Rug Gripper and Hold-It For Rugs are very similar products and serve nearly identical purposes: a fact which creates a greater likelihood of confusion.  See Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1507 (11th Cir. 1985).  In addition, both parties sell their products through the same type of retail

outlets.  In fact, because HCA substituted Hold-It For Rugs for Lok-Lift Rug Gripper in its retail accounts, the products were sold in the same stores.  Optimum asserts that both parties use similar advertising methods, i.e., in-store displays, which would support a finding of likelihood of confusion.  See Frehling Enters., Inc., 765 F.2d at 1508.  However, Optimum does not allege that HCA used the LOK-LIFT mark in its in-store advertising.  Rather, the only allegation of an infringing use of the mark attributable to HCA occurred on the Internet.  Optimum has not presented any evidence that it also advertises over the Internet.  Thus, this factor is inconclusive as to likelihood of confusion.

Finally, Optimum contends that HCA used the LOK-LIFT mark in an effort to derive a benefit from Optimum's reputation.  The evidence does not bear out this contention.  First, HCA did not adopt a trademark similar to LOK-LIFT for its own product.  Rather, the allegedly infringing uses occurred only on web site product search pages.  Moreover, before termination of the parties' relationship, HCA was authorized to use the LOK-LIFT mark.  The evidence indicates that when HCA replaced Lok-Lift Rug Gripper with Hold-It For Rugs, it took steps to make the corresponding changes on its web sites.  (Heffner Second Decl. ¶ 4.)  However, according to HCA, several references to Lok-Lift Rug Gripper were inadvertently left on the sites.  After being notified of the remaining references, HCA promptly removed

the marks from the product search pages.  (<u>Id.</u> at ¶ 7.)   This conduct does not evidence an intention on HCA's part to trade off of Optimum's good will.

Based on the strength of the mark, the use of identical marks, the similarity of the products, the similarity of sales channels, and the potential for initial interest confusion, the Court finds that Optimum has presented sufficient evidence to create a genuine issue of fact as to whether HCA's use of the LOK-LIFT mark on its web sites created a likelihood of confusion.  In addition, the Court notes that the potential for likelihood of confusion could be increased because of the prior relationship of the parties.  Courts have held that when a party formerly authorized to use a trademark continues to use the mark after losing its authorization, there is a stronger risk of consumer confusion.

> [A] licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder.  When such party . . . loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer.  Consumers have already associated some significant source identification with the licensor.  In this way the use of a mark by a former licensee confuses and defrauds the public.

<u>Church of Scientology Int'l v. Elmira Mission of the Church of Scientology</u>, 794 F.2d 38, 44 (2d Cir. 1986) (citations omitted); <u>see also</u> <u>Burger King Corp. v. Mason</u>, 710 F.2d 1480, 1492-93 (11th Cir. 1983) ("Common sense compels the conclusion that

a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."); <u>Sunsport Inc. v. Barclay Leisure Ltd.</u>, 984 F. Supp. 418, 422 (E.D. Va. 1997) ("As a former licensee who continues to use the licensor's mark, Sunsport has to overcome the presumption that it has infringed."); <u>American Farm Bureau Fed'n v. Alabama Farmers Fed'n</u>, 935 F. Supp. 1533, 1546-48 (M.D. Ala. 1996) (former affiliate's use of mark following termination of license created false impression of continued affiliation between the organizations).  Therefore, HCA's continued use of the LOK-LIFT mark on its web sites may have created the false impression that HCA's product remained affiliated with Optimum.  Because the Court cannot conclude as a matter of law that HCA's use of the LOK-LIFT mark did not cause a likelihood of confusion, summary judgment is not appropriate.

Optimum also alleges that HCA infringed its RUG GRIPPER mark on the web sites, and in sales pitches and presentations to retailers.  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects unregistered trademarks from infringement by unauthorized users where the unauthorized use is likely to cause confusion as to the source or sponsorship of goods or services.  <u>See</u> <u>Conagra, Inc. v. Singleton</u>, 743 F.2d 1508, 1512 (11th Cir. 1984).  To establish a violation of section 43(a), a plaintiff must prove that: (1) it has a valid trademark; and (2) the defendant used a mark likely to cause confusion.  <u>Gift of Learning</u>, 329 F.3d at 797.  Before addressing whether

HCA's use of the RUG GRIPPER mark was likely to cause confusion, the Court must determine whether Optimum has a protectable interest in the RUG GRIPPER mark.  Id.  To establish a protectable interest, Optimum must prove that the RUG GRIPPER mark is inherently distinctive, or is descriptive but has acquired secondary meaning.  Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1522 (11th Cir. 1991).

As discussed above, trademarks are classified into four categories based on the mark's distinctiveness.  To warrant protection, an unregistered mark must be arbitrary or fanciful or suggestive, i.e., inherently distinctive, or descriptive with secondary meaning.  Investacorp, Inc., 931 F.2d at 1522.  The parties do not seem to dispute that the RUG GRIPPER mark is descriptive, and the Court agrees.  One factor used by courts to determine whether a mark is descriptive is whether competitors in the same industry use the mark to describe their products.  Id. at 1523.  HCA has presented evidence that numerous producers of products used to keep rugs in place use the term "rug gripper" to describe their products.  (See Def.'s Reply, Ex. A.)  A dictionary definition is also probative of the descriptiveness of a mark.  Id. at 1523-24.  "Gripper" is defined as "a device that holds something firmly."  Webster's Third New International Dictionary 1000 (1976) ("Webster's Dictionary").  Therefore, the phrase

"rug gripper" literally conveys to the consumer that Optimum's product is used to hold rugs firmly in place, indicating that the mark is merely descriptive.

The United States Patent and Trademark Office ("PTO") relied on similar reasoning when it recently refused to register Optimum's RUG GRIPPER mark. (Def.'s Reply, Ex. A.)  In finding the mark to be merely descriptive, the PTO stated that: "In the relevant industry, the term 'rug gripper' is used to identify material used to hold a rug in place.  Since the applicant's goods are material used to hold rugs in place, or rug grippers, the proposed mark 'RUG GRIPPER' merely describes the applicant's goods."[5]  (Id.)  The Court agrees with the analysis of the PTO and also finds the RUG GRIPPER mark to be descriptive.

Because the RUG GRIPPER mark is descriptive, Optimum has the "burden of sustaining a high degree of proof" in establishing that the mark has acquired secondary meaning.  Investacorp, Inc., 931 F.2d at 1525.  Secondary meaning is the connection in the consumer's mind between the mark and the product's producer.  Id.  "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark."  Packman v.

---

[5]The PTO also noted that the RUG GRIPPER mark appears to be generic as applied to the goods at issue.  (Def.'s Reply, Ex. A.)

Chicago Tribune Co., 267 F.3d 628, 641 (7th Cir. 2001) (citing 2 McCarthy on Trademarks and Unfair Competition § 15:5 (4th ed.).  Optimum has not presented any consumer survey evidence to establish that its use of the RUG GRIPPER mark has attained secondary meaning.  Absent such evidence, a court should consider four factors in determining whether secondary meaning has attached: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to produce a conscious connection in the public's mind between the name and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff's product.  Investacorp, Inc., 931 F.2d at 1525 (citing Conagra, Inc., 743 F.2d at 1513).

The PTO cited numerous examples of products that use the RUG GRIPPER mark.  (Def.'s Reply, Ex. A.)  Accordingly, Optimum cannot claim exclusive use of the RUG GRIPPER mark.  Furthermore, Optimum has presented only minimal evidence in support of its claim that the RUG GRIPPER mark has acquired secondary meaning.  First, Optimum claims that it began using the RUG GRIPPER mark in connection with its product in 1984.  (Vicki McDermott Dep. at 83-84.)  However, it did not begin prominently displaying the mark on its packaging until HCA began distributing the Lok-Lift Rug Gripper product.  Second, Optimum asserts that it has spent several hundred thousand dollars advertising and promoting Lok-Lift Rug

Gripper through a video sales program, brochures, and print advertisements. However, the relevant question when considering whether a mark has obtained secondary meaning based on advertising and promotional activities is not simply the extent of the promotion but the effectiveness of associating the mark with the producer. Aloe Creme Labs., Inc. v. Milsan, Inc., 423 F.2d 845, 850 (5th Cir. 1970).[6] There is no evidence that Optimum's advertising and promotion focused on the RUG GRIPPER mark rather than simply on the functional aspects of the product. Thus, even if this level of advertising and promotion could be considered extensive, it does not necessarily indicate that consumers associate the mark with a particular source. See Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp., 716 F.2d 854, 860 (11th Cir. 1983). Optimum has failed to meet its burden of showing a high degree of proof that consumers associate Optimum with the term "rug gripper." Therefore, summary judgment for HCA is appropriate on Optimum's claims associated with the RUG GRIPPER mark.

2.      Trade Dress Infringement

Optimum alleges that HCA is liable for trade dress infringement because the Lok-Lift Rug Gripper packaging and Hold-It For Rugs packaging contain similar

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

elements.[7]   In addition to protecting certain unregistered marks, section 43(a) of the Lanham Act has been broadly construed to create a cause of action for trade dress infringement.  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000); Dippin Dots, Inc., 369 F.3d at 1202.   Trade dress refers to "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 (11th Cir. 1986) (quoting John Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)).  To prevail on a trade dress infringement claim, the plaintiff must prove that: (1) its trade dress is inherently distinctive or has acquired secondary meaning; (2) its trade dress is primarily nonfunctional; and (3) the defendant's trade dress is confusingly similar, i.e., creates a likelihood of confusion. University of Florida v. KPB, Inc., 89 F.3d 773, 776-77 (11th Cir. 1996); AmBrit, Inc., 812 F.2d at 1535.  Summary judgment is warranted if a defendant demonstrates that

---

[7]HCA moves for summary judgment on this claim.  Optimum effectively failed to respond.  Rather than address the merits of its trade dress infringement claim, Optimum simply argued that HCA's adoption of similar packaging elements, when combined with the alleged trademark infringement and false advertising, constitutes unfair competition. (Pl.'s Opp'n, at 28; see Pl.'s Supplemental Br. in Opp'n, at 2.) Although the Court could consider this a failure to respond, it cannot enter summary judgment for a defendant based solely on the adverse party's failure to respond. Trustees of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Employers v. Wolf Crane Serv., Inc., 374 F.3d 1035, 1039 (11th Cir. 2004).  Instead, the Court must consider the motion on its merits.  Id.

the plaintiff cannot prove any of the three elements.  Al-Site Corp. v. VSI Int'l, 174 F.3d 1308, 1326 (Fed. Cir. 1999) (applying Eleventh Circuit law).

"If the plaintiff's trade dress is not sufficiently distinctive to allow consumers to identify the product from the trade dress, then the dress does not inherently serve as an indication of origin and the plaintiff can claim no right to the exclusive use of the trade dress."  University of Florida, 89 F.3d at 776 n.5 (citing AmBrit, Inc., 812 F.2d at 1536).  To determine if a trade dress is inherently distinctive, the Eleventh Circuit has stated that a court should consider whether the trade dress is: (1) a common, basic shape or design; (2) unique or unusual in a particular field; and (3) a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods which consumers view as mere ornamentation.  Id.; see also Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977); 1 McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed.).  In addition, the distinctiveness of a product's trade dress can be measured by using the generic, descriptive, suggestive, and arbitrary or fanciful classifications established for trademarks.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-69 (1992); AmBrit, Inc., 812 F.2d at 1537.  As discussed above with regard to trademarks, a trade dress is inherently distinctive if it is suggestive or arbitrary or fanciful.  See Two Pesos, Inc., 505 U.S. at 769.

Optimum argues that its Lok-Lift Rug Gripper trade dress consists of packaging, in specific dimensions, with: (1) a picture of a floor rug being lifted to expose the product strips, on the front panel of the package; (2) a picture of a person vacuuming a floor rug, on the top panel; and (3) directions and diagrams explaining how to apply the product, on the rear panel.   HCA does not dispute that its Hold-It For Rugs packaging is similar to the Lok-Lift Rug Gripper packaging.   Nevertheless, HCA argues that Optimum's packaging is not entitled to trade dress protection because it is not inherently distinctive and has not acquired secondary meaning. Optimum provides no evidence to refute this argument.

Optimum's packaging with product pictures and instructions is a common, basic shape and design.   There is nothing unique or unusual about the size and type of packaging.   Nor is there anything inherently distinctive about the directions and diagrams contained on the back of the box.   Finally, the pictures featured on the packaging are not inherently distinctive but rather are likely to be viewed as a mere refinement of a common form of ornamentation for this class of products.   The evidence shows that a number of manufacturers of similar products use pictures of the corner of a rug being lifted to display the product.   (See Def.'s Reply, Ex. A.) Moreover, the pictures merely suggest the basic nature of and identify characteristics or qualities of the product.   Accordingly, the pictures are properly characterized as

generic or descriptive.  The elements of Optimum's packaging do not combine to create an overall impression that is inherently distinctive.  Therefore, the trade dress does not warrant protection unless Optimum can establish that it has acquired secondary meaning.  Two Pesos, Inc., 505 U.S. at 769.

As with trademarks, secondary meaning attaches to a trade dress when the public associates the packaging with a singular source for a given product.  See AmBrit, Inc., 812 F.2d at 1536 n.14.  Optimum has not presented any consumer survey evidence to demonstrate that its trade dress has attained secondary meaning.  As noted above, even without such evidence, secondary meaning can be established through circumstantial evidence, including the length of use of the trade dress, the extent of advertising and promotion, and the plaintiff's efforts to create a conscious connection in the public's mind between the trade dress and the plaintiff.  See Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc., 311 F. Supp. 2d 1353, 1357 (N.D. Ga. 2004) (citing Conagra, Inc., 743 F.2d at 1513).

Optimum fails to establish secondary meaning in its packaging.  First, there is no evidence that Optimum focused any of its advertising or promotion on its packaging.  See Brooks Shoe Mfg. Co., Inc., 716 F.2d at 860.  Moreover, Optimum has not presented any evidence that consumers associate the packaging with Optimum exclusively.  Prior to entering into a relationship with HCA, Optimum sold its product

in different packaging.  Optimum did not begin using the current packaging until after

the relationship was formed.  It is undisputed that HCA played a substantial role in

redesigning and creating the packaging at issue in this case, including redesigning the

sides of the packaging and changing the primary color.  (See Pl.'s Resp. to Def.'s

Statement of Material Facts, ¶ 63.)  Although Optimum contends that HCA only

borrowed elements from its established trade dress, the pre-HCA packaging appears

notably different than the packaging for which Optimum claims trade dress protection.

(See, e.g., Def.'s Mot. for Summ. J., Exs. 3, 76.)  In addition to modifying the design,

HCA added its name to the packaging.  As a result, it is unlikely that the public would

associate the packaging with a single source, rather than both Optimum and HCA.

Evidence that HCA was directly involved in developing the packaging and that its

name was prominently displayed on the front of the packaging weakens any potential

for secondary meaning.  See Blue Air, Inc. v. Soleus Mobility, Inc., No. 04 C 2207,

2004 WL 1459295, *3 (N.D. Ill. June, 25, 2004) ("[C]o-branding may result in mixed

consumer perception as to the source of the product, diluting the secondary meaning

of a products [sic] trade dress."); see also Donald R. Kirk, Franchise Dual-Branding:

The Irony of Association, 10 DePaul Bus. L.J. 1, 2 (1997) ("[D]ual-branding promises

to blur the consumers' perception of where a product or service that they are buying

originates.").   Optimum has not presented any evidence to establish otherwise.

Because its trade dress is not inherently distinctive and has not acquired secondary meaning, summary judgment is warranted.

### 3.   Unfair Competition

Optimum also asserts an unfair competition claim pursuant to 15 U.S.C. § 1125(a)(1)(A)[8] and the common law.   Optimum maintains that HCA selected trademarks and trade dress that are likely to cause consumer confusion because they falsely suggest an association or affiliation between Hold-It For Rugs and Optimum. (Compl. ¶ 104.)   Optimum argues that HCA's liability for unfair competition is based on the combined effect of its alleged trademark and trade dress infringement.[9]   Even if the trade dress infringement claim survived summary judgment, Optimum has not cited any case law to support its argument that a finding of unfair competition should be based on a totality of the defendant's actions.   Rather, the appropriate test for determining whether a defendant has violated section 43(a)(1)(A) is the likelihood of confusion test applicable to a trademark infringement claim.   Amstar Corp. v.

---

[8]Although Optimum cites the Lanham Act generally as the basis for its unfair competition claim, its allegations track the language of section 43(a)(1)(A). Thus, the Court will construe the claim as brought under this specific section.

[9]Optimum also argues that HCA's alleged false advertising contributes to the unfair competition claim.   However, because false advertising was not pled in the Original Complaint and the Court has previously denied Optimum's motion for leave to amend to add this claim, these allegations will not be considered.

Domino's Pizza, Inc., 615 F.2d 252, 258-59 (5th Cir. 1980); Nike Inc. v. Variety

Wholesalers, Inc., 274 F. Supp. 2d 1352, 1371 (S.D. Ga. 2003).   Likelihood of

confusion is also the appropriate test for assessing common law unfair competition.

Jellibeans, Inc., 716 F.2d at 839; Amstar Corp., 615 F.2d at 258-59; Step Co. v.

Consumer Direct, Inc., 936 F. Supp. 960, 967 (N.D. Ga. 1994).   Therefore, the

Court's analysis and disposition of the trademark infringement claim applies also to

the unfair competition claims brought under the Lanham Act and common law.  There

are genuine issues of fact for trial based on HCA's use of the LOK-LIFT mark on its

web sites.

4.     Georgia Uniform Deceptive Trade Practices Act

Optimum alleges that HCA violated several sections of the Georgia Uniform

Deceptive Trade Practices Act by selecting the trademarks and trade dress for the

Hold-It For Rugs product.   (See Compl. ¶ 109.)   Optimum contends that HCA

engaged in deceptive trade practices by causing a likelihood of confusion as to any

association, affiliation, authorization, or approval of the Hold-It For Rugs product by

Optimum.   See O.C.G.A. §§ 10-1-372(a)(1), (2), (3), and (5).[10]   As with the trademark

_____

[10]In its Opposition Brief, Optimum also argues that HCA engaged in deceptive
trade practices, in violation of O.C.G.A. § 10-1-372(5), by representing that Hold-It
For Rugs has characteristics, uses, or qualities that it does not have.  These allegations
are part of the false advertising claim, are not asserted in the Original Complaint, and
will not be considered by the Court.

infringement and unfair competition claims, the success of Optimum's deceptive trade practices claim depends on whether Optimum can establish a likelihood of confusion. Amstar Corp., 615 F.2d at 258-59 (same likelihood of confusion test applies to trademark infringement claim, Georgia deceptive trade practices claim, and common law and federal unfair competition claims); Board of Regents of the Univ. Sys. of Georgia v. Buzas Baseball, Inc., 176 F. Supp. 2d 1338, 1350-51 (N.D. Ga. 2001) (federal trademark infringement, federal and common law unfair competition, and deceptive trade practices claims require showing of likelihood of confusion); Energy Four, Inc. v. Dornier Med. Sys., Inc., 765 F. Supp. 724, 731 (N.D. Ga. 1991) (Georgia Uniform Deceptive Trade Practices Act and Federal Lanham Act involve same dispositive questions).   The Court's analysis of likelihood of confusion and disposition of the trademark infringement claim applies in the same manner to the deceptive trade practices claim.  Thus, genuine issues of fact remain.[11]

5.     Breach of Confidential Relationship and Fiduciary Duty

Optimum asserts that it had a confidential and fiduciary relationship with HCA that was violated when HCA failed to inform Optimum of its decision to substitute

---

[11]The Court notes, however, that injunctive relief is the only remedy available under the Georgia Uniform Deceptive Trade Practices Act.  O.C.G.A. § 10-1-373(a); Energy Four, Inc., 765 F. Supp. at 731; Catrett v. Landmark Dodge, Inc., 253 Ga. App. 639, 644 (2002).

Hold-It For Rugs for Lok-Lift Rug Gripper with respect to the retailers previously selling Optimum's product.  Accordingly, Optimum asserts claims for both breach of confidential relationship and breach of fiduciary duty.  Because a fiduciary duty arises only when parties enjoy a confidential relationship, these tort claims are essentially the same cause of action.  <u>Harris v. Fulton-DeKalb Hospital Auth.</u>, 255 F. Supp. 2d 1347, 1375 n.9 (N.D. Ga. 2002); <u>see also</u> Charles R. Adams III, <u>Georgia Law of Torts</u> § 33-8 (2004 ed.).  Under Georgia law, a confidential relationship arises where "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."  O.C.G.A. § 23-2-58.  The party alleging a confidential relationship bears the burden of proving its existence.  <u>Automated Solutions Enters., Inc. v. Clearview Software, Inc.</u>, 255 Ga. App. 884, 887-88 (2002).

As noted above, HCA and Optimum established a relationship whereby HCA would distribute Lok-Lift Rug Gripper to various retailers.  The parties never signed a formal, written agreement.  HCA maintains that the relationship was simply that of

manufacturer and distributor.  Optimum asserts that the parties were partners in a joint

venture and thereby entered into a confidential relationship.[12]

> A partnership has been defined as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions; and an association of two or more persons to carry on as co-owners a business for profit.

Peppas v. Miles, 82 Ga. App. 438 (1950); see O.C.G.A. § 14-8-6; Hayes v. Irwin, 541

F. Supp. 397, 415 (N.D. Ga. 1982) ("Generally speaking, a partnership is a voluntary

agreement between two or more persons to contribute their money, property, or skill

to the operation of a joint business or common enterprise for their common benefit

and to divide the profits and bear the losses in certain proportions.").  Evidence that

a partnership exists includes: (1) a common enterprise; (2) the sharing of risk; (3) the

sharing of expenses; (4) the sharing of profits and losses; (5) a joint right of control

over the business; and (6) a joint ownership of capital.  Jerry Dickerson Presents, Inc.

v. Concert/Southern Chastain Promotions, 260 Ga. App. 316, 323 (2003); see also

Hayes, 541 F. Supp. at 415.

A joint venture exists when "two or more parties combine their property or

labor, or both, in a joint undertaking for profit, with rights of mutual control."  Kelleher

---

[12]Neither party ever proposed that a separate and distinct entity representing the alleged joint venture partnership be formed.  (Lewis J. McDermott Dep. at 48.)

v. Pain Care of Georgia, Inc., 246 Ga. App. 619, 620 (2000) (quoting Rossi v. Oxley, 269 Ga. 82 (1998)).   The right of mutual control is a "crucial element" to the establishment of a joint venture.  Id.  Each member must have the right to direct and control the conduct of the other.  Id.  In most instances, there is essentially no difference between a partnership and a joint venture.  Thus, the same general rules and attributes apply to both.  See Aaron Rents, Inc. v. Fourteenth Street Venture, L.P., 243 Ga. App. 746, 748 (2000), aff'd, 274 Ga. 28 (2001); Vitner v. Funk, 182 Ga. App. 39, 42 (1987); Boatman v. George Hyman Constr. Co., 157 Ga. App. 120, 123 (1981).

In this case, there is a complete absence of the "crucial element" of the right of mutual control between Optimum and HCA.  Although both parties were interested in maximizing the sale of Lok-Lift Rug Gripper, "[m]ere business interdependency does not create a joint venture."  BP Exploration & Oil, Inc. v. Jones, 252 Ga. App. 824, 828 (2001) (citing Pope v. Goodgame, 223 Ga. App. 672, 674 (1996)).  Optimum and HCA each played a role in the sale of Lok-Lift Rug Gripper, but neither had the right to direct or control the conduct of the other.  Optimum's role was to manufacture the product; and it controlled all aspects of production, including the suppliers and the cost of production.  Moreover, Optimum bore the direct costs of manufacturing and producing the product.  On the other hand, HCA bore the costs of purchasing Lok-

Lift Rug Gripper from Optimum and selling the product to retailers, at prices set and controlled by HCA.

In addition to the lack of control over the conduct of the other party, Optimum and HCA never agreed to and did not share profits. (Lewis J. McDermott Dep. at 53, 79.) Although both companies generated profits based on the sale of Lok-Lift Rug Gripper, the profits were separate and generated from different sources. Optimum received its revenue from the direct sales of the product to HCA for a set price. HCA independently received its revenue based on sales of the product to retailers. These revenues were never combined nor did either party receive a percentage of any revenue received by the other.

Notwithstanding the fact that the parties had no right to direct or control each other and did not receive percentages of shared revenue, Optimum argues that a joint venture partnership, rather than a mere manufacturer/distributor relationship, existed because: (1) the parties often used the terms "partner" and "partnership" in their communications; (2) they both participated in decisions regarding changes to the product packaging; (3) they jointly contributed to a limited number of buy back programs; (4) Optimum turned over its retail accounts to HCA; (5) HCA was permitted to use Optimum's trademarks; and (6) Optimum disclosed certain confidential information, including customer lists and pricing information. Even if the

parties referred to one another as "partner," the existence of a legal partnership depends not on the labels attached by the parties but on the actual rights and responsibilities assumed by the parties.  Jerry Dickerson Presents, Inc., 260 Ga. App. at 322-23; see also Kennedy v. Thruway Service City, Inc., 133 Ga. App. 858, 860 (1975) ("Mere nomenclature is not of itself determinative as to whether a contract is one of guaranty or suretyship.  The contents of a can of sliced beets are not changed by a label denoting them to be garden peas.  It is the substance and the real intent of the parties which determine the character of an agreement.").  Furthermore, the terms "partner" and "partnership" are commonly used to describe many forms of personal and business associations, not just those with attendant legal rights and obligations. See Webster's Dictionary, at 1648 (partner defined as "one that is associated in any action with another: associate, colleague"; partnership defined as "the fact or state of being a partner: participation").  Therefore, the mere fact that HCA referred to Optimum as its partner does not establish the existence of a legal partnership.  The other facts cited by Optimum simply reinforce the notion that the parties enjoyed a mutually beneficial manufacturer and distributor relationship.  They do not, in and of themselves, reflect any legally-recognizable form of business partnership.

Optimum argues that, even if a joint venture partnership did not exist, a confidential relationship arose out of the mutual sharing of confidential information.

Most confidential relationships are created by law or contract, but a confidential relationship may arise out of the facts of a particular case. Cochran v. Murrah, 235 Ga. 304, 306-07 (1975). However, business relationships generally are not confidential relationships. Williams v. Dresser Indus., Inc., 120 F.3d 1163, 1168 (11th Cir. 1997); Newitt v. First Union Nat'l Bank, 270 Ga. App. 538, 546 (2004). Optimum does not cite to any Georgia case finding a confidential relationship arising out of a distributorship relationship. Nevertheless, it maintains that a confidential relationship was created out of the exchange of confidential information with HCA, including customer lists and pricing terms, market analyses, product performance data, sales techniques, manufacturing information, and prototypes of new technologies it developed. But, there is no evidence that sharing this information allowed either Optimum or HCA to exercise "a controlling influence over the will, conduct, and interest" of the other party. O.C.G.A. § 23-2-58. "The mere fact that one reposes trust and confidence in another does not create a confidential relationship." Automated Solutions Enters., Inc., 255 Ga. App. at 887 (quoting Bogle v. Bragg, 248 Ga. App. 632, 637-38 (2001)). Because no confidential relationship existed between Optimum and HCA, summary judgment on Optimum's breach of confidential relationship and breach of fiduciary duty claims is warranted.

6.      Fraudulent Concealment

Optimum alleges that HCA fraudulently concealed material information regarding the nature of the parties' relationship, HCA's plans to substitute Hold-It For Rugs for Lok-Lift Rug Gripper, and HCA's representations to retailers regarding the source of Lok-Lift Rug Gripper.  Under Georgia law, "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud."  O.C.G.A. § 23-2-53.  However, there must be an obligation to disclose before the defendant can be held liable for concealing material information.  <u>Stargate Software Int'l, Inc. v. Rumph</u>, 224 Ga. App. 873, 880 (1997) (<u>quoting</u> <u>William Goldberg & Co., Inc. v. Cohen</u>, 219 Ga. App. 628, 631 (1995)).  The duty to disclose "may arise from the confidential relations of the parties or from the particular circumstances of the case."  O.C.G.A. § 23-2-53; <u>Miller v. Lomax</u>, 266 Ga. App. 93, 97 (2004).

As discussed, no confidential relationship existed between Optimum and HCA and, thus, HCA had no obligation to disclose.  Optimum argues, however, that the circumstances of the case created a duty to disclose because it relied upon HCA to distribute Lok-Lift Rug Gripper and believed that HCA intended to continue distributing the product.  In addition, Optimum claims that only HCA had knowledge of its plans to develop and substitute Hold-It For Rugs for Lok-Lift Rug Gripper and terminate the distributorship relationship.  These facts are insufficient to give rise to a

duty to disclose.  HCA never remained silent in the face of an affirmative statement of assumption on the part of Optimum that its product would not be replaced by a substitute.  Cf. Clay v. Department of Transp., 198 Ga. App. 155, 158-59 (1990) (DOT had duty to disclose its plans to alter land's grade elevation when faced with seller's affirmative disclosure during negotiations that he was operating under the assumption and belief that the improvements would not damage the value of his remaining property).  Moreover, nothing in the parties' relationship precluded HCA from developing products to compete with Optimum.  Nor was HCA under any obligation to continue distributing Optimum's product indefinitely.  The oral distributorship agreement between the parties was not for a definite time.  (See Lewis J. McDermott Dep. at 69.)  It was therefore terminable at the will of either party.  See Jones v. Destiny Indus., Inc., 226 Ga. App. 6, 8 (1997); Loy's Office Supplies, Inc. v. Steelcase, Inc., 174 Ga. App. 701, 701-02 (1985).  Because HCA had no obligation to disclose information to Optimum, summary judgment on Optimum's fraudulent concealment claim is appropriate.

7.   Fraud and Negligent Misrepresentation

Optimum claims that HCA is liable for fraud and negligent misrepresentation based on a number of alleged misrepresentations regarding the nature of the parties' relationship.  In order to establish a fraud claim under Georgia law, the plaintiff must

establish: (1) a false representation by the defendant; (2) scienter, i.e., knowledge that the representation was false at the time it was made; (3) an intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff proximately caused by the reliance. Next Century Communications Corp. v. Ellis, 318 F.3d 1023, 1027 (11th Cir. 2003); Smiley v. S & J Investments, Inc., 260 Ga. App. 493, 499 (2003). A claim for negligent misrepresentation requires proof that: (1) the defendant negligently supplied false information to foreseeable persons; (2) such persons reasonably relied upon that information; and (3) such persons suffered economic harm proximately resulting from that reliance. MacIntyre & Edwards, Inc. v. Rich, 267 Ga. App. 78, 82 n.14 (2004) (citing Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 267 Ga. 424, 426 (1997)). These causes of action require essentially the same elements of proof, the only difference being whether the defendant intentionally or negligently made the misrepresentations. Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc., 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000); Anderson v. Atlanta Comm. for the Olympic Games, Inc., 261 Ga. App. 895, 900 (2003).

Optimum's fraud and negligent misrepresentation claims are based on the following alleged misrepresentations. First, at the time the parties entered into their relationship and then again in 1996, HCA represented that: (1) it would give Optimum

notice if it were to consider discontinuing sales of Optimum's product in favor of a lower-priced alternative; and (2) Optimum would have an opportunity to review its pricing structure if HCA was considering another product.   (Compl. ¶¶ 19, 74.) Second, in 1997 and 1998, HCA represented that, despite the change in ownership from Manco to HCA, there would be no material changes to the parties' relationship. (Id. ¶¶ 25, 74.)  Finally, in 2001, HCA represented that packaging changes that would reflect the new Henkel corporate image were forthcoming.  (Compl. ¶¶ 33-34, 74.)

Optimum's fraud and negligent misrepresentation claims based on HCA's statement that it would be making a packaging change fail as a matter of law because the statement was not false.  HCA sent a letter to all of its suppliers in November 2001, stating that new packaging was being developed for all of its products.  (Def.'s Mot. for Summ. J., Ex. 16.)  Optimum has not presented any evidence that this statement was false and that HCA was not planning and implementing a packaging change to coincide with the name change from Manco to HCA.  Moreover, even if the statement was false because the packaging change for Optimum's product was never effectuated, there is no evidence that this proximately caused damage to Optimum. Optimum claims that HCA, under the guise of a packaging change, required Optimum to receive permission before ordering additional packaging in an effort to minimize HCA's costs associated with product substitution.  (Pl.'s Resp. to Def.'s Statement

of Material Facts, at 67.)   Even assuming this was HCA's motivation, it does not

demonstrate that Optimum suffered any damage as a result of reducing its packaging

inventory.   Thus, summary judgment on the claims based on HCA's representations

regarding a packaging change is proper.

Likewise, the remaining alleged false misrepresentations are not actionable.  "It

is axiomatic that a false representation made by a defendant, to be actionable, must

relate to an existing fact or a past event.   Fraud cannot consist of mere broken

promises, unfulfilled predictions or erroneous conjecture as to future events."   Next

Century Communications Corp., 318 F.3d at 1027 (quoting Fuller v. Perry, 223 Ga.

App. 129, 131(1996)); see also Equifax, Inc. v. 1600 Peachtree, L.L.C., 268 Ga. App.

186, 195 (2004) ("The general rule is that actionable fraud cannot be predicated upon

promises to perform some act in the future.   Nor does actionable fraud result from a

mere failure to perform promises made.").   In addition, representations that are "mere

expressions of opinion, hope, expectation and the like" are not actionable.   Anderson,

261 Ga. App. at 900; see also Fuller, 223 Ga. App. at 131.   An exception to this

general rule exists when the promise regarding the future event is made with the present

intention not to perform.   Perimeter Realty v. GAPI, Inc., 243 Ga. App. 584, 595-96

(2000).   HCA's statements regarding the nature of the parties' relationship were simply

promises to perform in the future or expressions of opinion, hope, or expectation.

Optimum has failed to present any evidence that HCA did not intend to abide by the statements at the time they were made.  As such, these representations cannot form the basis of a fraud or negligent misrepresentation claim.  Summary judgment is appropriate.

## IV.  CONCLUSION

For the reasons set forth above, Defendant Henkel Corporation's Motion for Summary Judgment [Doc. 75] is GRANTED and Defendant Henkel Consumer Adhesives, Inc.'s Motion for Summary Judgment [Doc. 76] is GRANTED IN PART and DENIED IN PART.  The parties have fully briefed the issues raised at summary judgment, and scheduling oral argument at this late date will add unnecessary delay to the litigation.  Therefore, Defendant Henkel Consumer Adhesives, Inc.'s Request for Oral Argument [Doc. 154] is DENIED.

SO ORDERED, this 13 day of September, 2005.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge